Erik Strindberg (Utah Bar No. 4154)
Cameron Platt (Utah Bar No. 16548)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
Telephone:     (801) 359-4169
Facsimile:     (801) 359-4313
email:  erik@utahjobjustice.com
             cameron@utahjobjustice.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **BRANDON DODGE, JUSTIN PROKOPIS, TODD JOHNSON, KIYOSHI YOUNG, and MICHAEL DEGERING,**<br><br>Plaintiffs,<br><br>vs.<br><br>**UNIFIED FIRE AUTHORITY, MICHAEL JENSEN, in his individual and official capacities, and GAYLORD SCOTT, in his individual and official capacities,**<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br><br>Case Number: 2:18-cv-00838-BCW<br><br>Judge: Brooke C. Wells |

Plaintiffs Brandon Dodge ("Dodge"), Justin Prokopis ("Prokopis"). Todd Johnson ("Johnson"). Kiyoshi Young ("Young"), and Michael DeGering ("DeGering") (Dodge, Prokopis, Johnson, Young and DeGering collectively referred to as "Plaintiffs') submit this Complaint and 65B Petition against Unified Fire Authority ("UFA"), Michael Jensen ("Jensen"), and Gaylord Scott ("Scott")(UFA, Jensen and Scott will collectively be referred to as the "Defendants") as follows:

## NATURE OF CASE

1.      This is an action for damages and equitable relief, arising under 42 U.S.C. § 1983, resulting from the Defendants' actions in depriving the Plaintiffs of Equal Protection of the Law, as guaranteed under the Fourteenth Amendment. Specifically, Plaintiffs contend that the Defendants' conduct in the course of a hiring process that favored relatives of the then current command staff over non-relatives violated their constitutional rights. This classification – treating relatives more favorably than non-relatives - is not rationally related to a legitimate governmental interest. Plaintiffs also bring certain pendant state law claims of intentional interference with prospective economic rights. Plaintiffs seek prospective injunctive relief, back and front pay and benefits, damages, penalties, attorneys' fees, costs and interest.

## PARTIES

2.      Defendant UFA claims to be Utah's largest fire agency and provides services to over 400,000 in nine cities and five townships in Salt Lake and Utah counties.

3.      Defendant Jensen was the Fire Chief who headed UFA until he was forced out for improper and questionable conduct in the summer of 2016.

4.      Defendant Scott was the Deputy Chief at UFA, effectively the number two person reporting to Jensen, until he too was forced out in 2016.

5.      Plaintiff Dodge is a resident of Cottonwood Heights, Utah, and applied for a position as a full-time firefighter with UFA in the spring of 2011. He was not related to Chief Jensen, Deputy Chief Scott, or to any other UFA chiefs, managers or officials when he applied for a position.

6.      Plaintiff Prokopis is a resident of West Jordan, Utah, and applied for a position as a full-time firefighter with UFA in the spring of 2011. He was not related to Chief Jensen or

Deputy Chief Scott when he applied for a position.

7.     Plaintiff Johnson is a resident of Riverton, Utah, and applied for a position as a full-time firefighter with UFA in the spring of 2011. He was not related to Chief Jensen, Deputy Chief Scott, or to any other UFA chiefs, managers or officials when he applied for a position.

8.     Plaintiff Young is a resident of Salt Lake City, Utah, and applied for a position as a full-time firefighter with UFA in the spring of 2011. He was not related to Chief Jensen, Deputy Chief Scott, or to any other UFA chiefs, managers or officials when he applied for a position.

9.     Plaintiff DeGering is currently a resident of Pleasant Grove, Utah, and applied for a position as full-time firefighter with UFA in the spring of 2011. He was not related to Chief Jensen, Deputy Chief Scott, or to any other UFA chiefs, or officials when he applied for a position.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this matter and the Defendants pursuant to 28 U.S.C. §§ 1331, 1343 and 1367 as the case seeks redress under Federal law and/or are supplemental to such federal law claims.

11.     Venue is proper pursuant to 29 U.S.C. § 1391 as the complained of conduct occurred within this district and because UFA maintains its principal place of business in this district.

**LEGAL BACKGROUND**

12.     Firefighters hired by an agency in the State of Utah, including UFA, prior to July

3

1, 2011, were part of a retirement plan (administered by the Utah Retirement Systems) wherein they could retire at any age with 20 years of service and receive 50% of their average salary for their 3 highest years of earning. They were subsequently referred to as Tier I firefighters.

13.    Pursuant to legislation passed by the Utah legislature titled "New Public Safety and Firefighter Tier II Contributory Retirement Act" (U.C.A. § 49-23-101, et seq.), firefighters hired on or after July 1, 2011, were referred to as Tier II Hybrid firefighters and were enrolled in a much less beneficial retirement plan. While the new plan made several changes to retirement benefits, most importantly, Tier II firefighter could not retire (at any age) until they had worked for 25 years. Additionally, if they retired at that time they would only receive 37.5% of the average of their 5 highest years of earning.

## GENERAL ALLEGATIONS

14.    In approximately the early spring of 2011, UFA started a hiring process for new recruits who would become full-time, regular (i.e. year-round) firefighters. The recruitment for these new firefighters ("officers") was published and open to all applicants.

15.    However, according to information put out by UFA in May of 2011, applicants had to be certified as an EMT (Emergency Medical Technician) by the State of Utah before they would be interviewed by UFA and considered for hiring.

16.    The hiring process required each applicant to first take a written test. For applicants who scored high enough on the written test, UFA then offered them the opportunity to sit for an oral examination conducted by a board made up of upper level Chiefs, Battalion Chiefs and for some interviews, Captains employed by UFA.

17.    The written test and oral interview were both scored and the combined scores

4

were then used for the purpose of ranking each of the applicant. The written test comprised 30% of the total score and the oral examination 70%.

18.     Based on this ranking, a hiring list was created and for each position being filled, UFA would forward three names to Defendant Jensen (the so-called rule of "three"). UFA interpreted this to mean that if, for example, UFA was going to be filling 12 spots or positions, Defendant Jensen would receive a list of the thirty-six (36) "top" ranked applicants.

19.     Defendant Jensen, who was the final decision maker, then had the authority and discretion to hire any 12 applicants from the list of 36 that had been forwarded to him.

20.     The hiring list was to remain in effect and to be used to fill vacancies at UFA until May of 2013.

21.     However, because of the change in the retirement plan, those firefighters hired by UFA prior to July 1, 2011, would be placed in a much more favorable position regarding retirement benefits as they would be Tier I firefighters.

22.     UFA subsequently informed the Plaintiffs that UFA initially would be hiring between 12 and 16 people.

23.     At the time of the hiring announcement, four of the five Plaintiffs were experienced firefighters and were already working for UFA, albeit in a part-time basis, and several on its seasonal wildland fire crew[1]:

    a.  Dodge was working part-time as both a structural firefighter (a firefighter who

---

[1] Employees on UFA's wildland fire crew were part-time and seasonal, meaning they worked on an as-needed basis and only during the wild fire season (generally the spring and summer).

5

fights structure fires, such as house or office fires) and as a Utah State certified EMT, and had worked for both Salt Lake County and UFA for some ten years as a part-time firefighter at Station 108.

b.   Prokopis had spent a considerable amount of time completing the Recruit Candidate Academy at the Utah Fire Rescue Academy and had earned a Utah State certification as a Firefighter 1 and Firefighter 2. He was also a Utah State certified EMT

c.   Johnson had worked for UFA on its wildland fire crew for several years and was working as a part time structure firefighter and EMT for UFA, at the time he applied for a full-time position with UFA. He was also a Utah State certified EMT

d.   Young had also worked for UFA as a seasonal employee on its wildland fire crew and in fact at the time he applied for a full-time position with UFA was in a Supervisory position at the wildland fire program. He was also a Utah State certified EMT.

e.   DeGering had also worked for UFA for many years in its wildland fire program and at the time he applied for a full-time position was also in a Supervisory position in the wildland program. He was also a Utah State certified EMT.

24.   All five Plaintiffs sat for the written exam and scored well enough to be scheduled for an oral board examination.

25.   After the Plaintiffs had completed their oral examinations, on or about May 20, 2011, each Plaintiff received an email from the HR representative at UFA, indicating the score

6

that they had received on the written and oral exam, and their rank on the hiring list. UFA ranked the Plaintiffs as follows:

      a.   Young - #16

      b.   DeGering - #20

      c.   Dodge - #21

      d.   Prokopis - #22

      e.   Johnson - #33

26.     This email also stated that individuals who ranked high enough would be offered the opportunity to complete a physical performance test and go through a hiring interview. And that the physical performance test and interviews would take place between June 13th and June 20th of 2011.

27.     This email also stated that to be on the active hiring list and be considered for an interview, the applicant had to be "currently certified as an EMT in the state of Utah". All of the Plaintiffs met this qualification.

28.     In early June 2011, each of the Plaintiffs received another email from the HR department at UFA stating that they were among the top-ranked candidates and were "invited to participate in the remaining portions of the selection process," specifically the physical performance test followed by an interview.

29.     Each Plaintiff took part in and passed the physical performance test on or about June 17th and sat for a final interview. The final interviews were conducted by two Battalion Chiefs and an Assistant Chief who, it is believed, then discussed their conclusions with the Defendant Jensen and possibly Defendant Scott as well.

30.    A few days later, UFA notified each Plaintiff that they had "not been selected for one of the thirteen available positions . . ." No explanation was given as to why they were not selected or who had been selected.

31.    The Plaintiffs were perplexed that they had not been chosen as they had apparently done well on the written and oral exams, were certified as EMTs, were extremely well qualified and four of the five were already working for UFA, albeit on a part time basis.

32.    However, subsequent efforts by the Plaintiffs to determine why they had not been chosen and/or who had been chosen instead met with no success. UFA refused to give them any information whatsoever, and simply indicated that they would remain eligible for hire on the hiring list.

33.    Approximately one year later, UFA notified each of the Plaintiffs that UFA would be hiring additional firefighters on or about January 1, 2013.

34.    Each plaintiff went through the renewed hiring process and subsequently were hired by UFA at the beginning of 2013. However, because of the date of their hires they were classified as Tier II/Hybrid firefighters and as a result were put into the much less favorable retirement plan.

35.    Even after being hired, the Plaintiffs were unable to determine why others had been hired instead of them in 2011, or why they had been passed over for hiring in 2011. Any inquiries that the Plaintiffs made to HR or other command staff were rebuffed and Defendants repeatedly told that the 2011 hiring process was fair and above board.

36.    Sometime in the later part of 2016, after Defendants Jensen and Scott had been forced out of their positions at UFA, the State Auditor for Utah performed an audit on "certain

aspects of the Unified Fire Authority's (UFA) internal control and compliance for the period of January 1, 2011 through July 31, 2016 . . .".

37.     The Audit Report was given to the UFA Board on or about January 17, 2017, and subsequently became available to the public, including members of Salt Lake County Firefighters Local 1696, which represented the firefighters, including the Plaintiffs, who worked at UFA.

38.     Although this Audit Report focused on a number of improprieties in the way Defendants Jensen and Scott had conducted themselves, it also contained a section addressing issues during the 2011 hiring process. A copy of that section of the audit is attached as Exhibit A.

39.     As a result of this Audit Report, the Plaintiffs learned for the first time that there were indications that preferential treatment probably had been given to family members during the hiring process.

40.     The pertinent section of the Audit Report started out by stating that "[i]n June 2011, the son and brother-in-law of the former Chief were hired by UFA. We found departures from standard hiring practices which were designed to financially benefit the former Chief's son and brother-in-law . . ."

41.     The Audit Report then listed those departures:

    a.  That the Chief had requested that a condensed EMT class be held during 17 days
        in June of 2011 so that his son and brother-in-law would meet UFA's
        requirement that all hires be certified as EMTs;

    b.  That because of the hasty way the class was organized it was not full which was
        counter to past practices as EMT courses had been designed to cover all of

UFA's costs. However, UFA personnel were instructed to hold the course regardless of cost;

c.  That UFA generally hired employees at the beginning of a bi-monthly pay period. However, in this case, UFA hired its June 2011 class on June 27th, four days before the beginning of the pay period, so that the Chief's son and brother-in-law would qualify for Tier I retirement benefits; and

d.  Finally, that there were indications of "preferential treatment [to family members] during the interview process in comparison to other candidates, particularly given the family members' limited experience" (though no specifics were given).

42.  After receiving this Audit Report, the Plaintiffs, through Local 1696, contacted the HR department and again requested information about the hiring process and the hiring list which had been created in 2011. Although UFA had previously refused to provide this information, in February of 2011, UFA finally turned over the hiring list to Local 1696 and Plaintiffs, perhaps because Defendants Jensen and Scott were no longer employed by UFA.

43.  After receiving the list, the Plaintiffs were able to see for the first time who had been hired and their positions on the list in June of 2011. They then began making inquiries to determine why those individuals had been hired, if they were related to any management personnel, and if they were given special treatment.

44.  Based on their inquiries Plaintiffs were able to determine that not only had the son and son-in-law of Defendant Jensen been hired in June of 2011, but that in total 9 of the 12 applicants offered positions at that time were related to either the Chief, Deputy Chief, an

10

Assistant Chief, Battalion Chief, or in one case, a Captain in the Department.

45.    Of particular concern was that the son and son-in-law of Defendant Jensen, who were hired in 2011, had absolutely no experience in fire-fighting, unlike the Plaintiffs. The son of Defendant Jensen was hired directly out of high school and the son-in-law had been working as a plumber.

46.    In addition, neither the son or son-in-law had been certified as EMTs until they went through the special EMT class which UFA had offered in June of 2017 at the direction of Defendant Jensen.

47.    Based on these findings the Plaintiffs directed their attorney to serve a Notice of Claim on UFA. A copy of that Notice, which sets forth potential claims for the tort of intentional interference with economic advantage and for a claim under Utah R. Civ. P. 65 is attached as Exhibit B.[2]

48.    UFA, through its attorneys, denied Plaintiffs' claims in a letter dated November 6, 2017. Interestingly in that denial, UFA acknowledges that "some relatives were hired" in 2011, but claimed that the hiring of relatives happened every year.

49.    After the Audit Report was published a separate investigation was apparently undertaken by the Utah Attorney General's office, which issued its report on or about September 1, 2018.

50.    The AG's report detailed how family members were classified differently and

---

[2] The Notice of Claim did not set forth Plaintiffs' Constitutional claim as it is not necessary to include that in a Notice of Claim.

treated more favorably than non-family members during the hiring process in an effort to hire as many family members as possible before July 1, 2011.

51.     The AG's report set forth how the favorable treatment given to family members distorted the hiring process. One area of favorable treatment was the holding of a special EMT training course to allow Defendant Jensen's son and son-in-law to become EMT certified and therefore eligible for hire prior to July 1, 2011. As detailed in the AG's report, not only did UFA hold the special course but it also:

a.   Ran the course full-time, instead of part-time, so that it would be completed prior to the interviews in June. UFA had never before run a full-time class and has never done again;

b.   Gave family members discounts from the normal tuition and allowed them to pay for the class after the class began (while other attendants were required to pay up front);

c.   Allowed Defendant Jensen's son to miss class hours without reporting his absences, although to qualify for Utah State certification as an EMT a certain number of hours of training were required (a number which was not met by Defendant Jensen's son);

d.   Changed scores of family members in exchange for favorable treatment of an examiner's son in a different course; and

e.   Made special arrangements to have the testing done immediately following the completion of the class, again so the participants would qualify for the interviews.

12

52.    In addition to holding the special EMT class, the AG's report also confirmed that UFA had deviated from its standard hiring practice of starting new hires at the beginning of a bi-monthly pay period by having this new group, which predominately was made up of family members, start working on June 27, 2011. This enabled them to qualify for the Tier 1 retirement.

53.    The AG's report also uncovered rumors of a "Study Guide" being given to family members to prepare for the initial written test. As detailed in the report:

    a.    A copy of the initial written test was given to Defendant Scott, despite there being a security agreement with the test company; and

    b.    A request by Human Resources to change to a different test was denied by Defendants Scott and Jensen.

54.    The AG's report also explained how family members received preferential treatment during the oral board examinations, which accounted for 70% of the ranking score. This allowed the family members to receive artificially high rankings on the hiring list. As detailed in the report, this preferential treatment included:

    a.    Manipulation of the oral scores of family members to make them higher than appropriate;

    b.    Changing scores (upward) of family members after they had been submitted by the examiners;

    c.    Telling examiners that family members were to be given "5's" which was the highest score;

    d.    Removing one examiner from the panel, and latter disciplining him, when he refused to give family members 5's.

55.    Finally, and in addition, Plaintiffs now have also been told that some family members received special training which allowed them to successfully pass the physical performance exam.

56.    As determined in the AG's report, Defendants' policy of classifying and treating family members and relatives of management personnel more favorable than non-family members resulted in the hiring of family members although in some cases they were substandard and had a low level of aptitude than Plaintiffs.

## FIRST CAUSE OF ACTION

**(Violation of Plaintiffs' Equal Protection Rights under the Fourteenth Amendment)**

57.    Plaintiffs incorporate the factual allegations contained in the paragraphs above as if fully set forth herein.

58.    At all times relevant hereto, Defendants Jensen and Scott acted under color of state law and had final policy making authority for UFA when the complained of acts occurred.

59.    As discussed above, during the 2011 hiring process Defendants intentionally classified and treated applicants who were family members and relatives of the command staff much more favorably than non-family member applicants.

60.    This favorable treatment included the intentional distortion and manipulation of the hiring process by, among other things, providing written tests to family members (before the exam) and giving them the highest grades during the oral exam, even if such grades were not warranted.

61.    This preferential treatment of family members created a mechanism whereby those family member applicants could be hired prior to the July 1, 2011, the cutoff date for Tier I

14

firefighters, thereby ensuring that those family members would receive significantly better retirement benefits than those hired at a later date.

62.     The actions of the Defendants in classifying applicants by familial status, and giving favorable treatment to family members, deprived Plaintiffs and other non-family member applicants of the guarantees of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and thereby violates their rights protected by that provision.

63.     Defendants' classification and treatment of applicants according to family status was irrational and not related to, nor did it serve, any legitimate governmental interest and therefore was unconstitutional.

64.     Additionally, Defendants' conduct violated clearly established constitutional rights of equal protection of which a reasonable person should have known.

65.     Because the Defendants have violated Plaintiffs' equal protection rights, which violation has significantly injured the Plaintiffs, Plaintiffs are entitled to relief, including damages and injunctive relief, pursuant to 42 U.S.C. § 1983.

66.     In addition, Plaintiffs are entitled to compensatory damages, as well as punitive damages against Defendants Jensen and Scott inasmuch as they either acted with evil motive or intent, or with reckless indifference to the federally protected rights of the Plaintiffs.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Relations)

67.     Plaintiff incorporates the facts contained in the paragraphs above as if fully set forth herein.

68.     As set forth above, Defendants intentionally interfered with Plaintiffs' potential

15

economic relations by manipulating the 2011 hiring process so that family members were hired over the more qualified Plaintiffs and other non-family members.

69.    Defendants acted with improper means as their actions violated Plaintiffs' constitutional rights, Utah law prohibiting nepotism in public employment, and those Utah statutes which required ethical conduct on the part of public officials.

70.    Defendants' actions have significantly damaged Plaintiffs by forcing them into a much less favorable retirement plan, and Plaintiffs are entitled to recover for their losses.

71.    In addition, because Defendants Jensen and Scott acted willfully and fraudulently, they are not immune from suit and are also liable for the damages they caused Plaintiffs.

72.    Plaintiffs are also entitled to an award of punitive damages against Defendants Jensen and Scott inasmuch as they acted either willfully and maliciously, or with knowing and reckless indifference and disregard toward the rights of Plaintiffs.

## THIRD CAUSE OF ACTION
### (Equitable Relief under Rule 65)

73.    Plaintiff incorporates the facts contained in the paragraphs above as if fully set forth herein.

74.    If the Court determines that Plaintiffs have no other plain, speedy or adequate remedy or cause of action, Plaintiffs are still entitled to extraordinary relief under Utah Rules of Civil Procedure, Rule 65B(d)(2) inasmuch as the Defendants manipulated the 2011 hiring process to prevent Plaintiffs from being timely hired as Tier I firefighters.

75.    The Plaintiffs have been injured by the capricious and arbitrary conduct of the Defendants and are entitled to the relief set forth in the prayer for relief.

## JURY DEMAND

76.     Plaintiffs, by and through counsel of record, hereby demand a trial by jury of any issue triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against Defendant as follows:

1.     For an order and judgment against Defendants for lost back pay, lost retirement benefits and reimbursement for Plaintiffs' other pecuniary losses;

2.     For an order giving Plaintiffs seniority rights based on a hire date of June 27, 2011;

3.     For compensatory damages to compensate Plaintiffs for their emotional distress, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be established at trial;

4.     For Plaintiffs' reasonable attorneys' fees and costs;

5.     For entrance of an order prohibiting UFA from treating applicants or employees more favorably than others based on their familial status;

6.     For such prospective injunctive relief and damages as is necessary to eliminate and prevent Defendants' unconstitutional conduct and to make Plaintiff whole; and

7.     For such further and other relief the Court deems appropriate.

DATED this 26th day of October, 2018

**STRINDBERG & SCHOLNICK, LLC**

/s/ Erik Strindberg
Erik Strindberg
Cameron Platt
Attorneys for Plaintiffs

17